UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

HOPE WILKES,                              )
                                          )
      Plaintiff,                         )      1:09-CV-329
                                          )
v.                                        )
                                          )      Chief Judge Curtis L. Collier
T-MOBILE and T-MOBILE USA, INC.,          )
                                          )
      Defendants.                        )

## MEMORANDUM

Before the Court is a motion for summary judgment filed by T-Mobile and T-Mobile USA, Inc. ("Defendants") (Court File No. 16), to which Plaintiff Hope Wilkes ("Plaintiff") responded (Court File No. 21) and Defendants replied (Court File No. 22). Plaintiff, a former employee of Defendants, claims she was discriminated against and terminated in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"), the Tennessee Human Rights Act, Tenn Code Ann. §§ 4-21-101 *et seq.* ("THRA"), and the Tennessee Maternity Leave Act, Tenn. Code Ann. § 4-21-408 ("TMLA"). Defendants moved for summary judgment on all claims.

After carefully considering the parties' arguments (Court File Nos. 16,17, 18, 21, 22), the Court will **GRANT** Defendants' motion (Court File No. 16).

## I.    RELEVANT FACTS

Plaintiff worked for the defendants as a customer service representative ("CSR") in the call center from February 2008 until January 2009. Plaintiff worked five days a week and was responsible for taking calls regarding the accounts for customers who had mobile devices from T-Mobile. She reported to Coach Tiffany Douglas ("Douglas"), who in turn reported to Team

Manager Steven Bechard ("Bechard")(Court File No. 18-4 ("Wilkes Dep.") p. 20). [1] During her employment, Plaintiff was described as "a good employee" (Bechard Dep. at 71) and had received an award for being a top team performer a few weeks before her employment ended (Wilkes Dep. at 43).

In the summer of 2008, during her employment with Defendants, Plaintiff began pursuing her master's degree in human resource management from the University of Phoenix and Defendants reimbursed her for tuition (Wilkes Dep. at 14-15). Plaintiff received tuition reimbursement benefits amounting to about $5,000 (*id.* at 92). At some point prior to August 2008, Plaintiff began seeking a promotion by applying for positions through an internal application process. Defendants have a system where employees may apply at any time to available positions by completing a template application form (Wilkes Dep. at 28-29). This process does not generate paper documents and Plaintiff states she submitted applications for any openings for which she was qualified (*id.* at 33-34). Plaintiff has no documentation of her applications and is unable to recall the titles of the positions to which she applied, the number of applications submitted, or the dates of her applications (*id.* at 28-35). Plaintiff found out she was pregnant in late August 2008 and states she submitted at least one application around the time she found out she was pregnant (*id.* at 28, 31-32). Plaintiff was never promoted during her employment with Defendants. Neither Bechard or Douglas had any knowledge Plaintiff applied for any other positions (Douglas Dep. at 39; Bechard Dep. at 41). Douglas explained that when an application was submitted, "a form comes back that we have

---

[1] Both parties filed excerpts from depositions of Hope Wilkes (Court File Nos. 18-4, 21-1), Tiffany Douglas (Court File Nos. 18-5, 21-3), and Steve Bechard (Court File Nos. 18-6, 21-2). For the sake of clarity, the Court will refer to these exhibits simply as "Wilkes Dep.," "Bechard Dep.," and "Douglas Dep." with citations to the page numbers of the depositions rather than the actual filings.

to fill out as far as all of [the applicant's] performance, how long they have been in their position, and then it is automatically forwarded on" (Douglas Dep. at 40).

Plaintiff told Douglas she was pregnant at the end of August 2008 (Wilkes Dep. at 49; Douglas Dep. at 37). Plaintiff claims that in the fall of 2008, she spoke with Bechard about "career pathing into the HR role" and Bechard told her "maybe I should wait until after my baby - - I should wait until after my baby before I career pathed so that I know whether I want a career with the company or a family" (Wilkes Dep. at 47). Around this time Plaintiff and Douglas also discussed Plaintiff's going to school for human resources and her interest in pursuing a career in that area (Douglas Dep. at 39; Wilkes Dep. at 50-51). Plaintiff alleges Douglas told her something like it was not the "best time to apply for the promotion since [she] was about [to] start a family" (Wilkes Dep. at 51). Douglas informed Plaintiff about a program where individuals can "shadow" someone in the human resources department to learn more about the job itself (Douglas Dep. at 39).

Douglas admits to knowing Plaintiff was pregnant and to speaking with her about an interest in human resources, however, she denies making any statement about any relation between promotion and pregnancy (Douglas Dep. at 42). According to Douglas, "[p]regnancy has nothing to do with promoting. We've got so many people pregnant in our call center now" (*id.*). Bechard denies having any conversation with Plaintiff regarding "career pathing" to human resources and states he did not even know Plaintiff was pregnant until after her employment had ended (Bechard Dep. at 39, 83-84). Plaintiff gave birth to her first child in May 2009 (Wilkes Dep. at 8) and Douglas testified Plaintiff was not visibly pregnant when her employment ended in early January 2009 (Douglas Dep. at 38).

Sometime after Plaintiff's conversations with Bechard and Douglas, Plaintiff spoke with

3

Felicia Pierce ("Pierce") in the human resources department about shadowing opportunities and "doing her FMLA papers" (Wilkes Dep. at 54). Pierce told Plaintiff that she should schedule an appointment with Mr. Dale Jones, an employee in human resources whom she could shadow (*id*.). Plaintiff never contacted Mr. Jones because her employment ended shortly after she spoke with Pierce (*id.* at 54-55).

At some point during the summer of 2008, Plaintiff requested certain days off around the Thanksgiving and Christmas holidays including December 24 and 26, 2008. Although she was initially granted this leave, she later received an email indicating her request needed to be re-submitted. When she took this email over to discuss it with human resources, she was told by Pierce that because of a computer "system glitch" Plaintiff would have to work those days. Plaintiff was explicitly informed by Pierce that she was required to report for work on both December 24 and 26 (Wilkes Dep. at 58-59).

Early in the morning on December 24, Plaintiff claims she received a phone call from her mother who informed Plaintiff that Plaintiff's brother had attempted suicide by swallowing pills (Wilkes Dep. at 65-66). Plaintiff immediately left to help her mother and brother and arrived in Trenton, Tennessee at approximately 8:00 a.m. (*id*. at 67).[2] When Plaintiff arrived, she found her brother sleeping and was told by her cousin (who is a nurse) that "he should be able to sleep it off" (*id*. at 68). After Plaintiff's brother woke up, Plaintiff and her mother helped him find a place and moved him out on December 24 and 25 (*id.* at 68-69). Plaintiff does not believe her brother received any medical or psychological treatment after the incident (*id.* at 68). On December 26, Plaintiff

---

[2] This testimony conflicts with phone records provided by Defendants. There was no record of any cell phone calls from Plaintiff's mother to anyone early in the morning on December 24, and Plaintiff's cell phone records show there were no calls received between 5:59 p.m. on December 23 and 2:33 p.m. on December 24 (Court File Nos. 17, p. 6; 18-1, p. 3; 18-2, p. 3).

stayed with her mother to help her straighten up her house after her brother's move (*id.* at 69).

According to Defendants' attendance policy, "[e]mployees who are unable to work as scheduled are required to contact their coach and Resource Planning at least one hour prior to the beginning of their scheduled shift start time" (Court File No. 21-1, p. 52). Plaintiff received a subsequent form from her coach, Douglas, which indicated Plaintiff was to contact Bechard if she was going to be late or absent (Wilkes Dep. 36-37, 94). Plaintiff claims the directions on the form were to call Bechard at his office number and leave him a voicemail if an employee was unable to reach him (*id.* at 37). Bechard disputes this and claims the form actually listed his cell phone number rather than his office number (Bechard Dep. at 53). Plaintiff also had Douglas's cell phone number (Wilkes Dep. at 37-38). Douglas claims Plaintiff was provided with Bechard's cell phone number as part of her initial paperwork (Douglas Dep. at 32). Bechard testified the only number he would give out was his cell phone because he worked at multiple desks throughout the day and had as many as three different desk phones where he checked messages (Bechard Dep. at 75-76). Bechard further explained that because Douglas was an hourly employee and her shift would start the same time as those she supervised, employees were to contact Bechard instead of Douglas so they could reach someone an hour before their shift was to begin (*id.* at 53-54). Douglas indicates employees were supposed to call both her and Bechard in the event of an absence, in fact, if employees could not get Bechard, they "would definitely call me so I would know because I need to call it in to our resource planning department to let them know and also so I would know where they are" (Douglas Dep. at 19-20).

At approximately 1:00 p.m. on December 24, Plaintiff states she called Bechard's desk phone at the office number and not his cell phone (Wilkes Dep. at 69-70). Plaintiff left a voicemail

5

message for Bechard indicating she had "a family emergency" and "wouldn't be able to make it in to work" on December 24 or 26 (*id.* at 70, 72). She also sent a text message to Douglas stating she would be absent but this message was sent after her shift had begun (Court File 18-4, p. 56). Douglas received a text message from Plaintiff in which Plaintiff indicates she left a message on Bechard's office phone and that she had a family emergency keeping her out the rest of the week (Douglas Dep. at 23). Bechard contacted Plaintiff later in the day and told her she was a "no call/no show" for the day (Wilkes Dep. at 71). Bechard indicated he was very upset as this was "totally unacceptable" and he would speak to her when she returned on Monday (*id. at* 71-72).

Bechard, after discussing Plaintiff's conduct with his HR team and Vincent Rawlings, Bechard's associate director, decided to remove Plaintiff from good standing (Bechard Dep. at 66-67). Bechard also discussed this decision with Douglas (Douglas Dep. 46-47). Removal from good standing is a form of probation which lasts 90 days, during which time Plaintiff would not be eligible for tuition reimbursement benefits, promotions or bonuses, and would not have scheduling flexibility (Wilkes Dep. at 92, Bechard Dep. 47-48, 65-67). If an employee has no other occurrences of violations during the 90-day period, he or she is placed back in good standing (Bechard Dep. 47-48). Bechard claims the paperwork had been prepared to remove Plaintiff from good standing, however, he never provided the forms to Plaintiff because the "conversation changed course" (Bechard Dep. at 68).

On January 2, 2009, Plaintiff met with Bechard in a conference room. During this meeting, Bechard told Plaintiff that because she failed to follow proper procedure by contacting both Bechard and Douglas, she was terminated for being a "no call/no show"(Wilkes Dep. at 78-79). Plaintiff stated Bechard then asked for her badge and escorted her to the front area at which time he said

6

"well, you're pregnant anyway" (*id.* at 79). Bechard disputes Plaintiff's description of the meeting and instead claims that he met with Plaintiff to discuss her actions regarding the time off and "the process that she took in informing us that she was not coming to work" (Bechard Dep. at 68). Bechard told her the decision was made remove her "good standing" and Plaintiff became irate and walked out of the conference room, slamming the door (*id.;* Court File No. 21-1, p. 50). Bechard followed Plaintiff to her desk and tried to continue the discussion but she refused and said she was quitting (*id.* at 69). Bechard then asked for her badge and walked with her as she exited the building (*id.*). Bechard claims he did not know Plaintiff was pregnant at this time and did not learn of her pregnancy until after her employment ended (*id.* at 39, 83-84).

Pierce contacted Plaintiff for an exit interview on January 5, 2009, and wanted to discuss Plaintiff's resignation (Wilkes Dep. at 87; Court File No. 18-4, p. 62). Pierce indicated she understood Plaintiff's badge was taken because Plaintiff was resigning, but Plaintiff informed Pierce that she had been terminated (*id.*). Pierce advised there must have been a misunderstanding because she was not terminated and "if she wants to continue her employment she should report to work today" (Court File No. 18-4, p. 62). Pierce informed Plaintiff she could return to work in her current position but would be removed from good standing (Wilkes Dep. at 92). Plaintiff rejected this offer because she "didn't want that job," she felt penalized for no reason, and because a lack of good standing would deprive Plaintiff of eligibility for tuition benefits and bonuses (*id.* at 91-93).

Plaintiff filed the instant action on December 23, 2009, claiming Defendants unlawfully discriminated against Plaintiff on the basis of her pregnancy and that her termination was in violation of the FMLA. Defendants moved for summary judgment on all claims.

## II. STANDARD OF REVIEW

Summary judgment is proper if the movant shows, based on the materials in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party must demonstrate no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based solely on its allegations, but must submit significant probative evidence to support its claims. *Celotex*, 477 U.S. at 324; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

The moving party is entitled to summary judgment if the non-movant fails to make a sufficient showing on an essential element for which it bears the burden of proof. *Celotex*, 477 U.S. at 323. In short, if the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court may enter summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III. ANALYSIS

A.     PREGNANCY DISCRIMINATION

Plaintiff argues Defendants discriminated against and terminated her on account of her pregnancy, in violation of the THRA. Under the THRA, it is an unlawful discriminatory practice for an employer to discharge an individual because of her pregnancy. Tenn. Code Ann. § 4-21-401(a)(1); *Spann v. Abraham*, 36 S.W.3d 452, 463-64 (Tenn. Ct. App. 1999). Claims of discrimination brought pursuant to the THRA are analyzed under the same analytical framework and federal case law that applies to claims brought pursuant to Title VII. *Spann*, 36 S.W.3d at 463.

Where, as here, there is no direct evidence of discrimination,[3] Plaintiff's circumstantial evidence is analyzed under the burden-shifting framework established by the Supreme Court. *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802-804, 807 (1973); *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000). Under *McDonnell-Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination; the burden then shifts to the employer to articulate some legitimate, non-discriminatory explanation for its actions; finally, the burden shifts back to the plaintiff to demonstrate the employer's explanation was pretext. *McDonnell Douglas*, 411 U.S. at 802-804, 807. Throughout this burden shifting, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000); *DiCarlo v. Potter*, 358 F.3d 408, 414-415 (6th Cir. 2004). The plaintiff cannot rely purely on "mere personal belief, conjecture and speculation" as they "are insufficient

---

[3] "Direct evidence is the evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Although Plaintiff alleges certain comments regarding pregnancy made by Bechard and Douglas, these require an additional inference to connect them with any adverse employment decision and therefore do not constitute direct evidence.

9

to support an inference of age [or pregnancy] discrimination." *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997).

Plaintiff must first establish a prima facie case by showing: "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Cline*, 206 F.3d at 658. In her complaint, Plaintiff points to three separate adverse employment decisions: (1) a denial of promotion to a supervisory position, (2) a denial of salary increase to which she was entitled, and (3) her termination on January 2, 2009 (Court File No. 1, ¶¶ 7-8, 12). Plaintiff appears to have withdrawn the second claim as she purportedly "admitted on deposition that she never talked to anyone at T-Mobile about seeking a raise" (Court File No. 17, p. 3).[4] Plaintiff does not challenge Defendants' description of the testimony regarding a raise nor do they brief this aspect in their response. The Court will therefore consider Plaintiff's denial of a salary increase claim abandoned and will only address Plaintiff's failure to promote and termination arguments.

### 1. **Failure to Promote**

Plaintiff claims Defendants engaged in an ongoing violation of the THRA by failing to promote her because of her pregnancy. Plaintiff accuses Defendants of "surreptitiously ignor[ing] her online applications for promotion on the grounds that she would be starting a family" and claims there is a factual dispute of whether Defendants intentionally overlooked Plaintiff's electronic applications (Court File No. 21, p. 14-15). Defendants argue Plaintiff cannot present a prima facie case since she has not identified any promotion which she was denied. Defendants also challenge the denial of promotions as time-barred because none purportedly occurred after December 24,

---

[4] In support of this statement, Defendants cite pages of Plaintiff's deposition, which were not included in those provided to the Court.

2008.

A prima facie case of failure to promote requires Plaintiff to demonstrate: "1) [s]he is a member of a protected class; 2) [s]he applied for and was qualified for a promotion; 3) [s]he was considered for and denied the promotion; and 4) other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000). Although Plaintiff's burden at the prima facie stage is "not onerous," *see Cline*, 206 F.3d at 660, Plaintiff must at a minimum point to some particular position for which her application for a promotion was denied. Plaintiff claims she applied for one or more positions before she even learned she was pregnant, at least one sometime after learning she was pregnant but cannot identify any particular position she sought. The comments made by Douglas and Bechard regarding timing of her "career pathing" to human resources do not reference a specific promotion and are contradicted by the undisputed fact Douglas and Pierce both proceeded to provide Plaintiff with information about shadowing to learn more about the job requirements of human resource employees. Both Douglas and Bechard denied knowledge of any specific applications submitted by Plaintiff. Plaintiff's generalized statement she applied to every position for which she was qualified does not supply a required element of her prima facie case. Plaintiff has not identified a single instance where her application for a position was denied in favor of a non-pregnant employee.

The Court therefore finds Plaintiff has not established a prima facie case of a discriminatory failure to promote and summary judgment is appropriate. The Court need not reach the issue of whether any such claim would be time-barred because it is unclear when any applications were filed or when the resulting promotions, if any, occurred.

    **2.**    **Wrongful Termination**

Plaintiff has asserted a claim of wrongful termination and contends she was terminated and/or constructively discharged because of her pregnancy. Defendants argue this claim fails as a matter of law because there was no constructive discharge or termination and because Defendants' reason for removing good standing was nondiscriminatory and unrelated to her pregnancy. Here, the parties do not dispute Plaintiff was pregnant and she was otherwise qualified for her job. At issue, is whether there was an adverse employment decision and if so, whether there was a substantial nexus between Plaintiff's pregnancy and this decision.

Viewing the facts in the light most favorable to the plaintiff, Bechard told Plaintiff she was terminated on January 2, 2009. A termination would clearly be an adverse employment decision, however, in this case, it is undisputed Pierce contacted Plaintiff on January 5, 2009, and informed Plaintiff that the defendants had understood Plaintiff resigned, but if this was not the case, Plaintiff could continue her employment on the terms she would be taken out of good standing (Wilkes Dep. 87). Plaintiff declined the offer to continue in her position without good standing. During this temporary period without good standing, Plaintiff would lose tuition benefits of about $5,000, she would have no flexibility in scheduling, and she would not be eligible for promotions or bonuses. Plaintiff claims removal of good standing was a constructive discharge.

To establish a constructive discharge, Plaintiff must prove Defendants "deliberately created intolerable working conditions, as perceived by a reasonable person, and 2) [Defendants] did so with the intention of forcing the employee to quit." *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001) (citations omitted). The Court must make a determination that "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have been compelled to resign." *Smith v. Henderson*, 376 F.3d 529, 533-534 (6th Cir. 2004)(citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).

In *Logan*, the Sixth Circuit identified relevant factors to assist in making a constructive discharge determination, which include: "reduction in salary" and "continued employment on terms less favorable than the employee's former status." 259 F.3d at 569. It is undisputed Plaintiff would be deprived of bonuses, tuition benefits, scheduling flexibility, and opportunities to seek promotion while she was not in "good standing." A temporary loss of these benefits technically constitutes "less favorable terms" of her former position. However, viewing the facts in the light most favorable to the plaintiff, a reasonable person in Plaintiff's position would not find the temporary changes to Plaintiff's position intolerable. *Contra Smith v. Henderson*, 376 F.3d 529, 537-538 (6th Cir. 2004) (finding valid claim of constructive discharge based on employer's denial of a reasonable accommodation for disabled plaintiff such that she would be " compelled to quit her job in order to preserve her health"); *Logan*, 259 F.3d at 571-72 (finding an offer of continued employment conditioned on a demotion in position, reduction in salary, and change in job duties "created an intolerable work condition such that a reasonable person standing in Plaintiff's shoes would have felt compelled to resign"); *Jacobs v. Martin Sweets Co., Inc.*, 550 F.2d 364, 370 (6th Cir. 1997) (finding what appeared to be a permanent demotion from executive secretary to clerical duties in the Purchasing Department to be considered intolerable). Here, Plaintiff was asked to return to her same position with the same responsibilities and salary subject to a probationary period due to her failure to report for work as scheduled.

Plaintiff similarly cannot establish Defendants imposed these conditions to force Plaintiff to quit. Plaintiff alleges Bechard specifically told her she was terminated on January 2, 2009. Three days later, Plaintiff received an offer to return subject to a period without good standing. If Plaintiff was told she was terminated, the Court fails to see how a subsequent offer to authorize her return to a former position was a deliberate action to force Plaintiff to quit. Plaintiff testified she was

13

terminated and only learned of the deprivation of good standing condition in her later conversation with Pierce. There would be no logical reason to force someone to quit after they had been terminated.

Because Plaintiff has not established an essential element of her prima facie case, the Court will grant Defendants' motion for summary judgment on Plaintiff's claim of wrongful termination.

### B. FMLA and TMLA VIOLATIONS

Plaintiff also claims her termination violated the TMLA and the interference and retaliation provisions of the FMLA. The FMLA provides eligible employees with up to 12 weeks of leave per 12-month period "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter." 29 U.S.C. § 2612(a)(1)(B). An "eligible employee" is defined as an employee who has been employed "for at least 12 months" and "for at least 1,250 hours of service" by the employer with respect to whom the leave is requested. 29 U.S.C. § 2611(2)(A). The TMLA allows employees "who have been employed by the same employer for at least twelve (12) consecutive months as full-time employees" to be absent for a period of up to four months for adoption, pregnancy, childbirth and nursing an infant. Tenn Code. Ann. § 4-21-408.

The Court of Appeals for the Sixth Circuit acknowledges two theories of recovery under the FMLA. *Edgar v. JAC Products, Inc.*, 443 F.3d 501, 507-08 (6th Cir. 2006). The "entitlement" or "interference" theory recognizes employers may not "interfere with, restrain, or deny the exercise or attempt to exercise any right provided" by the FMLA. 29 U.S.C. § 2615(a)(1). The "retaliation" or "discrimination" theory arises from the provision making it "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2).

To prevail on an interference claim, a plaintiff must show Defendants interfered with a FMLA

right to medical leave or to reinstatement following FMLA leave. *Arban v. West Pub. Corp.*, 345 F.3d 390, 401 (6th Cir. 2003). Plaintiff must show: "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Edgar*, 443 F.3d at 507. Under the retaliation theory, Plaintiff must establish she: (1) engaged in a statutorily protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *Id. (citing Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

Plaintiff undisputedly worked for Defendants for less than twelve months and is not within the statutory definition of an eligible employee. As Plaintiff notes, this Court in *Wright v. Marshal Mize Ford, Inc.*, No. 1:09-CV-139, 2010 WL 3843780 at * 7 (E.D. Tenn. Sept. 27, 2010), held recovery under either the interference or retaliation theories was limited to "eligible employees." In so holding, the Court followed the controlling authority of the Sixth Circuit decisions. *See, e.g., Staunch v. Cont'l Airlines, Inc.*, 511 F.3d 625, 629-31 (6th Cir. 2008) (finding Plaintiff's FMLA claims fail as a matter of law where employer established the plaintiff worked less than the requisite 1,250 hours preceding her request for FMLA leave); *see also Davis v. Mich. Bell Tel.* Co., 543 F.3d 345, 354 (6th Cir. 2008) ("To the extent that [the plaintiff] is claiming that she was terminated because of her attempt to obtain FMLA leave in January of 2005, her claim must fail as a matter of law because she was not eligible for FMLA benefits"); *Humenny v. Genex Corp., Inc.*, 390 F.3d 901, 905-06 (6th Cir. 2004) ("in an FMLA retaliation case. . . if the plaintiff does not qualify as an 'eligible employee,' the plaintiff does not state a claim for relief under the FMLA.")*; Stimpson v. United Parcel Serv.*, 351 F. App'x 42, 45 (6th Cir. 2009) ("The FMLA thus makes clear that only

'eligible employees' may recover under the statute."). Based on the relevant and binding authority, this Court finds Plaintiff is not entitled to relief as a matter of law.

Furthermore, even if Plaintiff had qualified as an eligible employee, her FMLA and TMLA claims would fail on other grounds. There is no indication Defendants denied Plaintiff the right to take FMLA leave, a necessary element of an interference claim. Plaintiff's unauthorized leave on December 24 and 26, 2008, was not protected FMLA leave. The lack of an adverse employment action as discussed *supra* Section III A 2, is also fatal to her prima facie case for retaliation. Even if Plaintiff was originally told she was terminated, as soon as human resources contacted her for her exit interview, she was offered to continue in her position. Although a temporary removal of good standing was imposed, Plaintiff has made no claim that removal of good standing would unlawfully deprive her of her ability to take FMLA or TMLA leave if the need arose.

The Court therefore concludes Defendants are entitled to judgment as a matter of law on Plaintiff's FMLA and TMLA claims.

## IV. CONCLUSION

For the above reasons, the Court will **GRANT** Defendants' motion for summary judgment (Court File No. 16).

An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**